UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _12/2/2021__
```

------------------------------------------------------------------X
MIRTILL LEWIS and ELVIRA LEWIS,                                   :
                                                                  :
                                 Plaintiffs,                      :
                                                                  :
                      -v-                                         :          18-cv-8662 (LJL)
                                                                  :
LENDLEASE (US) CONSTRUCTION LMB INC., and                         :          OPINION AND ORDER
THE NEW YORK AND PRESBYTERIAN HOSPITAL,                           :
                                                                  :
                                 Defendants.                      :
                                                                  :
------------------------------------------------------------------X
                                                                  :
LANDLEASE (US) CONSTRUCTION LMB INC.,                             :
                                                                  :
                                 Third-Party Plaintiff,           :
                                                                  :
                      -v-                                         :
                                                                  :
X-CELL INSULATION CORPORATION,                                    :
                                                                  :
                                 Third-Party Defendant.           :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On September 17, 2018, Plaintiff Mirtill Lewis fell from a ladder while working at a

construction site.  Mirtill Lewis and his wife, Elvira Lewis (together, "Plaintiffs"), sued the

contractor managing the construction, Lendlease (US) Construction Lmb Inc. ("Lendlease"), and

the owner of premises where construction was taking place, the New York and Presbyterian

Hospital ("NYP").  Plaintiffs bring claims for violations of the New York Labor Law ("NYLL")

and New York regulations and for loss of consortium and companionship.  Dkt. No. 80 ("Second

Am. Compl.").  Lendlease in turn filed a third-party complaint against X-Cell Insulation

Corporation ("X-Cell" and together with Lendlease and NYP, "Defendants"), Mirtill Lewis's

employer at the time of the incident and a subcontractor of Lendlease, bringing claims for contractual and common-law indemnity and breach of contract.  Dkt. No. 88.  In its answer to Plaintiffs' Second Amended Complaint, NYP asserted crossclaims against Lendlease and X-Cell for contribution and common-law indemnification and against Lendlease for contractual indemnification and insurance coverage.  Dkt. No. 90.

## BACKGROUND

Except where otherwise indicated, the following facts are drawn from the parties' Local Rule 56.1 statements and counterstatements and the undisputed evidence in the record, and they are construed in the light most favorable to the non-moving party.  *See* Dkt. Nos. 140, 155, 159, 184, 185.  The facts are undisputed unless otherwise noted.

In the fall of 2013, NYP and Lendlease entered into a contract, pursuant to which Lendlease would manage the construction at the Milstein Hospital Building (the "premises"). *See* Dkt. Nos. 139-1; 140 ¶¶ 2, 4; 155 ¶¶ 2, 4; 159 ¶ 2; 185 ¶¶ 2, 4.  Lendlease hired subcontractors to perform construction work at the premises, Dkt. No. 140 ¶ 4, and it had the authority to stop a subcontractor's work if the work was being performed incorrectly or if the work violated safety protocols, *id.* at ¶ 5.  On or about April 30, 2018, Lendlease and X-Cell entered into a contract for X-Cell to perform firestopping and fireproofing work on the seventh floor of the premises.  *Id.* ¶ 6.  Lendlease had the authority to stop X-Cell's work if Lendlease deemed it to be unsafe, *id.* ¶ 7, and further had the authority to, at its sole discretion, terminate its subcontract with X-Cell, *id.* ¶ 8.  Lendlease inspected the work of subcontractors, including of X-Cell, and gave instructions to the subcontractors about the work that needed to be done and where it needed to be performed, *id.* ¶ 9, but Lendlease did not direct or instruct the subcontractors *how* to perform the work, Dkt. Nos. 155 at 4; 164 at 4; 185 at 4.

On September 17, 2018, Mr. Lewis was employed by X-Cell and was performing firestopping and fireproofing work on the seventh floor of the premises—premises which were owned by defendant NYP at the time.  Dkt. No. 140 ¶¶ 1, 10.  Mr. Lewis, who is 5' 4", was not working with a partner that day and was the only employee of X-Cell working on the seventh floor.  *Id.* ¶¶ 11, 13.  At the time of the incident, he was standing with both feet on the same rung of an extension ladder performing firestopping and fireproofing work, *id.* ¶ 14; Dkt. No. 139-7 at 89, which includes filling holes with mineral wool and using a spray gun to apply fireproof insulation.  Dkt. Nos. 140 ¶ 12; 159 ¶¶ 8, 12.  "The extension ladder which [Mr. Lewis] was using was the best, most appropriate and safest ladder for the job, and the type of ladder X-Cell employees would be expected to use when performing the firestopping and fireproofing work that [Mr. Lewis] was performing."  Dkt. No. 140 ¶ 29.  No one was holding the extension ladder while Mr. Lewis was working on it.  The extension ladder was leaning against the wall, Dkt. Nos. 140 ¶ 14; 159 ¶ 18,[1] and had feet that contained some metal.  Dkt. Nos. 140 ¶ 14; 155 ¶ 14; 139-7 at 48:13; 153-8 at 3.  The drop ceiling around where Mr. Lewis was working had been removed, but a long, thin piece of black iron piping was left hanging horizontally from the ceiling.  Dkt. No. 140 ¶ 14.  Mr. Lewis was not wearing and did not request a harness or a lanyard, which he understood was only required to be worn when working over six feet.  Dkt. Nos. 159 ¶ 14; 139-7 at 26, 42.

---

[1] Defendant NYP disputes the fact asserted that the ladder "had been leaned up against the top of a wall," Dkt. No. 140 ¶ 14, as unsupported by evidence in the record.  *See* Dkt. No. 185 at 6.  Indeed, Mr. Lewis's testimony at his deposition is that the top of the ladder was leaning against the wall, Dkt. No. 139-7 at 66:18–21, 70:23–25, not that the ladder was leaning against the top of the wall.  The Court does not understand NYP to dispute that the ladder was leaning against the wall.

After Mr. Lewis finished stuffing mineral wool into an opening, he reached for his spray gun, which was hanging from the rung of the ladder above his right shoulder.  Dkt. Nos. 140 ¶ 15; 139-7 at 82; 146 at 6–7; 155 at 6–7; 185 at 6–7.  What happened next is disputed.  Mr. Lewis asserts that he reached for the spray gun, his hand hit the piece of black iron that was hanging between the ladder and his body, the piece of black iron hit his shoulder, and the extension ladder began to shake and move.  Dkt. Nos. 140 ¶ 15; 139-7 at 74–76, 84–85. According to Mr. Lewis, this caused him to lose his balance and fall off the ladder; he fell feet first, landing on his heels, and collapsed onto the ground.  Dkt. Nos. 140 ¶ 15; 139-7 at 84–85, 88–93.

Defendants dispute that there is evidence that Mr. Lewis fell because the ladder shook. X-Cell points out that Mr. Lewis's "own signed description of the accident was that he slipped and fell off of the ladder," Dkt. No. 155 at 7, while NYP and Lendlease explain that Mr. Lewis "testified that he reached for the spray gun, bumped into the black iron and lost his balance," Dkt. Nos. 146 at 7; 185 at 7.  Mr. Lewis's signed accident report does state that "[w]hile on the ladder, [b]lack iron pushed against my chest.  At this point I lost my balance and I fell to the ground," Dkt. No. 153-4.  Lendlease's incident report states both that "[d]ue to the reaching [up to the wall,] [Mr. Lewis] lost [his] balance and started to fall," Dkt. No. 153-7 at 2, and "[w]hile reaching to the left of the ladder, [he] lost [his] balance and started to fall," *id.* at 4.  All Defendants state that "[t]he claim that the ladder shook before Mr. Lewis fell is disputed (and in fact is unsupported)."  Dkt. Nos. 146 at 7; 155 at 7; 185 at 7.  Defendants also point out that, after the incident, Mr. Lewis did not tell anyone that the ladder shook before he fell, Dkt. Nos. 146 at 7, 8; 155 at 7, 13; 185 at 7.

4

The parties' accounts largely, but not entirely, reconverge after Mr. Lewis's fall.  After Mr. Lewis fell, Lendlease's Assistant Superintendent, Andrew Cohen, received a phone call from a carpenter for another subcontractor that was working on the premises, informing Mr. Cohen that someone had fallen on the seventh floor but that the carpenter did not witness the fall. Dkt. No. 140 ¶ 17.  Mr. Cohen immediately went to the seventh floor of the premises and spoke to Mr. Lewis, who was lying on the floor.  *Id.* at ¶ 18.  Mr. Lewis told Mr. Cohen that he had fallen off the ladder and could not walk.  *Id.*  Plaintiffs assert that Mr. Cohen was provided with no additional information, but Defendants dispute this, pointing to Mr. Cohen's deposition testimony that, in the incident report he authored, the description of the accident in his report was from his discussion with Mr. Lewis.  Dkt. Nos. 146 at 8; 155 at 8; 185 at 5.  In his deposition, Mr. Cohen explained that he did not recall his specific conversations with Mr. Lewis, but because he had written certain information in the incident report, he "must have gotten that information" from Mr. Lewis, and Mr. Cohen further explained that he did not believe that he based descriptions in the "event details" portion of the incident report on his own assumptions rather than on conversations with Mr. Lewis.  Dkt. No. 139-3 at 112–15.

After Mr. Lewis was removed from the seventh floor of the premises in a wheelchair, Mr. Cohen had a conference call with other employees of Lendlease regarding the incident.  Dkt. No. 140 ¶ 21.  Mr. Cohen was instructed to take photographs of the area where Mr. Lewis had fallen. *Id.*  Mr. Cohen took the photographs that day, *id.*, and they show that the height of the wall where Mr. Lewis was working was 11' 7", *id.* at ¶ 22.  Mr. Cohen also called Dean Halverson from X-Cell and advised him that there had been an accident.  *Id.* at ¶ 23.  In a subsequent conversation, Mr. Cohen told Mr. Halverson that there were no witnesses to Mr. Lewis's fall.  *Id* ¶ 27.  Mr. Cohen testified that he did not recall Mr. Lewis telling him that the ladder moved

before Mr. Lewis fell. Dkt. No. 139-3 at 155. The day of the incident, Mr. Lewis and Mr. Halverson exchanged text messages but not about how the incident occurred. Dkt. No. 140 ¶ 24. No one from NYP spoke to Mr. Lewis regarding the incident or investigated the circumstances surrounding it. *Id.* ¶ 28.

After he fell, Mr. Lewis was transported to the emergency room of NYP. *Id.* ¶ 20. He was operated on and remained in the hospital until September 25, 2018. *Id.* ¶ 25; *see also* Dkt. Nos. 139-11; 139-8.

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment against defendants Lendlease and NYP on the issue of liability under sections 240(1) and 241(6) of the NYLL and against Lendlease on the issue of liability under NYLL § 200. Dkt. No. 137. Defendants Lendlease and NYP cross-move for summary judgment dismissal of all claims and crossclaims asserted against them. Dkt. Nos. 156; 181.[2]

## DISCUSSION

A grant of summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v.*

---

[2] Lendlease, which is being defended and indemnified by X-Cell's insurance carriers up to its coverage limits, also moves for contractual indemnification, pursuant to the Subcontract, against X-Cell for any verdict above its coverage limits. Dkt. No. 158 at 29–30. In response, X-Cell argues that Lendlease is not entitled to summary judgment on its claims for contractual indemnification because there are triable issues of fact as to Lendlease's liability for Plaintiffs' injury. *See* Dkt. No. 164. NYP similarly moves for a conditional order granting contractual indemnity against Lendlease, pursuant to their contract. Dkt. No. 182 at 19–21. The Court will resolve these issues by separate order.

*Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted).  "[I]n assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).  Where each party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Plaintiffs move for summary judgment against Lendlease and NYP on the issue of liability under NYLL §§ 240(1) and 241(6) and against Lendlease on the issue of liability under

NYLL § 200.  Lendlease opposes Plaintiffs' motion and cross-moves for summary judgment against Plaintiffs, arguing that Plaintiffs' claims fail as a matter of law.  Dkt. No. 158.

## I.    Sections 240(1) and 241(6) of the NYLL

Plaintiffs and Lendlease and NYP cross-move for summary judgment on Plaintiffs' claims under NYLL §§ 240(1) and 241(6).  Plaintiffs claim that the undisputed facts establish Lendlease's and NYP's liability under the two provisions.  Lendlease and NYP argue that the facts entitle them to summary judgment.  The Court denies the motions for summary judgment on the claim regarding Section 240(1) except insofar as it relates to Lendlease's ability to be held liable as a statutory agent of NYP. There are disputed issues of fact regarding the movement of the ladder.  It grants Lendlease and NYP summary judgment on the motion regarding NYLL § 241(6).

### A.    NYLL § 240(1)

Section 240(1) of the NYLL provides that:

All contractors and owners and their agents . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

Plaintiffs argue that they are entitled to summary judgment against Lendlease and NYP on their claim for a violation of NYLL § 240(1).  Plaintiffs specifically contend that there is uncontroverted evidence that the ladder Mr. Lewis was working on was unsecured and that the ladder shook and moved before Mr. Lewis fell off of it, causing his fall.  Dkt. No. 138 at 17–18. According to Plaintiffs, "where a worker falls from an unsecured ladder that moved, and the fall was caused by the failure to secure the ladder, [the worker] is entitled to summary judgment . . . because the failure to properly secure a ladder so as to hold it steady and erect during its use

constitutes a *prima facie* violation of [NYLL] § 240(1)." *Id.* at 17.  Thus, the argument goes,

NYP and Lendlease, as the owner of the premises and its general contractor and/or agent,

respectively, are liable for this violation.  *Id.* at 18–19.

       To prevail on a cause of action for a violation of NYLL § 240(1), a plaintiff must prove

that the defendant violated that statute and that "the violation was a contributing cause of his

fall."  *Blake v. Neighborhood Hous. Servs. of N.Y. City*, 1 N.Y.3d 280, 287 (2003).  "The failure

to provide safety devices constitutes a per se violation of the statute and subjects owners and

contractors to absolute liability, as a matter of law, for any injuries that result from such failure."

*Cherry v. Time Warner, Inc.*, 66 A.D.3d 233, 235 (1st Dep't 2009).  "[W]ith regard to accidents

involving ladders, 'liability will be imposed when the evidence shows that the subject ladder . . .

was inadequately secured and that . . . the failure to secure the ladder was a substantial factor in

causing the plaintiff's injuries.'"  *Von Hegel v. Brixmor Sunshine Square, LLC*, 180 A.D.3d 727,

729 (2d Dep't 2020) (quoting *Canas v. Harbour at Blue Point Home Owners Assn., Inc.*, 99 A.D.

3d 962, 963 (2d Dep't 2012)); *DeSerio v. City of New York*, 171 A.D.3d 867, 867–68 (2d Dep't

2019) (same); *Baugh v. N.Y.C. Sch. Constr. Auth.*, 140 A.D.3d 1104, 1105 (2d Dep't 2016)

(same).  There are thus two relevant questions in determining whether a violation of NYLL §

240(1) has occurred: (1) whether the ladder failed to provide proper protection; and (2) if so,

whether the failure to provide proper protection was a cause of the plaintiff's injuries.  *See*

*Canas*, 99 A.D.3d at 964.

       A violation of NYLL § 240(1) "creates absolute liability."  *Zimmer v. Chemung Cty.*

*Performing Arts,* 65 N.Y.2d 513, 522 (1985).  "[C]ontributory negligence will not exonerate a

defendant who has violated the statute and proximately caused a plaintiff's injury."  *Blake*, 1

N.Y.3d at 286.  The unavailability of contributory negligence as a defense to a Section 240

violation is rooted in the history and worker-protective purpose of the provision.  New York's first scaffold law, an early version of Section 240(1), was enacted in 1885 to address the injuries associated with "scaffolding, hoists, stays, [and] ladders" and to "give proper protection to the worker."  *Blake*, 1 N.Y. at 285 (internal quotation marks omitted).  In enacting NYLL § 240, the state legislature recognized that people working at elevated heights "are scarcely in a position to protect themselves from accident" and often "have no choice but to work with the equipment at hand," notwithstanding the associated dangers.  *Koenig v. Patrick Contr. Corp.*, 298 N.Y. 313, 318 (1948).  The legislature thus "imposed upon employers or those directing the particular work to be done, a flat and unvarying duty" to ensure that the equipment used provides proper protection to workers, *id.* at 318–19, "impos[ing] the responsibility for safety practices on those best suited to bear that responsibility," *Ross v. Curtis-Palmer Hydro-Electric Co.*, 81 N.Y.2d 494, 500 (1993).   Section 240(1) and "section 241(6) impos[e] liability upon a general contractor for the negligence of a subcontractor, even in the absence of control or supervision of the worksite."  *Rizzuto v. L.A. Wenger Contr. Co.*, 91 N.Y.2d 343, 348–49 (1998) (emphasis omitted).  By imposing "absolute liability," Section 240(1) prevents "owners and contractors [from] diminish[ing] their obligations under that statute and . . . set[ting] their own standard of care for the protection of workers at the worksite."  *Zimmer*, 65 N.Y.2d at 524.  And given that Section 240 is a statute "for the protection of workmen from injury and undoubtedly is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed," *Koenig*, 298 N.Y. at 319 (quoting *Quigley v. Thatcher*, 207 N.Y. 66, 68 (1912)), the New York Court of Appeals has recognized that it would be incompatible with this worker protective purpose to allow a defendant to escape liability for a Section 240 violation because of a plaintiff's contributory negligence, *see id.* at 318.

Though a plaintiff's contributory negligence will not absolve a defendant of liability under NYLL § 240(1), a defendant will not be held liable if the plaintiff is the "sole proximate cause" of his injury.  As the New York Court of Appeals has explained, "[u]nder [NYLL] § 240(1) it is conceptually impossible for a statutory violation (which serves as a proximate cause for a plaintiff's injury) to occupy the same ground as a plaintiff's sole proximate cause for the injury. . . . [I]f the plaintiff is solely to blame for the injury, it necessarily means that there has been no statutory violation." *Blake*, 1 N.Y.3d at 290.

Plaintiffs contend that they are entitled to summary judgment because, in their view, the undisputed evidence demonstrates both that the unsecured ladder Mr. Lewis was working on shook and moved and that its movement caused his fall.  "It is well settled that failure to properly secure a ladder to insure it remains steady and erect while being used, constitutes a violation of Labor Law § 240(1)." *Cuentas v. Sephora USA, Inc.*, 102 A.D.3d 504 (1st Dep't 2013) (quoting *Schultze v. 585 W. 214th St. Owners Corp.*, 228 A.D. 2d 381 (1st Dep't 1996)); *see also DaSilva v. A.J. Contracting Co.*, 262 A.D.2d 214 (1st Dep't 1999).  The theory is that "when the [safety] device collapses, moves, falls, or otherwise fails to support the plaintiff and his or her materials" it fails to provide proper protection.  *Melchor v. Singh*, 90 A.D.3d 866, 868 (2011).

Thus "[w]hether a device provides proper protection is a question of fact, except when the device collapses, moves, falls, or otherwise fails to support the plaintiff and his or her materials." *Id.*; *Taglioni v. Harbor Cove. Assoc.*, 308 A.D. 2d 441 (2d Dep't 2003) ("[T]he question of whether the ladder provided the employee with the proper protection required under this statute is a question of fact for the jury.").  Where a plaintiff establishes that an unsecured ladder shakes and moves, causing the fall giving rise to the injury, he has established a *prima facie* case that the ladder did not provide him with proper protection, in violation of NYLL

§ 240(1). *Melchor*, 90 A.D.3d at 868. At his deposition, Mr. Lewis testified both that the ladder "started moving" and "shaking" before he lost his balance and fell off of it. Dkt. No. 139-7 at 84, 88, 90. He also testified that, when he fell off the ladder, he was in a lot of pain and "didn't really look at the ladder" but that he "think[s] it must have moved a little bit." *Id.* at 92. There is therefore some evidence in the record that the ladder moved and was thus unsecured and that this movement caused Plaintiff to lose his balance and fall.[3]

But this is not the only evidence in the record—Defendants have pointed to evidence that tends to refute Mr. Lewis's testimony. In the report that Mr. Lewis filled out on the day after the incident, he did not mention anything about the ladder beneath him moving, simply writing that he "lost [his] balance and [] fell to the ground." Dkt. No. 153-4.[4] Similarly, the incident report filled out by Andrew Cohen of Lendlease, which Mr. Cohen testified that he believed was based on conversations with Mr. Lewis, Dkt. No. 139-3 at 112–14, only states that Mr. Lewis "lost [his] balance and started to fall," Dkt. No. 153-7. Nor is there any evidence that, after the accident, Mr. Lewis told anyone that the ladder moved and caused him to fall.

Neither side is entitled to summary judgment. On Plaintiffs' motion for summary judgment, drawing all inferences in favor of the nonmoving party—Lendlease and NYP—a reasonable jury could conclude that the ladder did not move, and that it was in fact was stable

---

[3] There is law to the effect that evidence that a ladder "shook," without more, is not sufficient to make a *prima facie* case that a ladder did not provide proper protection. *See Joseph v. 210 W. 18th Street*, 189 A.D.3d 1384, 1385 (2d Dep't 2020) (holding that plaintiff could not satisfy *prima facie* burden that ladder was an inadequate safety device through claim that the ladder "shook" when there was no evidence submitted "that the ladder moved out of position, so as to indicate that it was inadequately secured"). Because Mr. Lewis testified that the ladder moved and shook, the Court need not consider whether that law properly interprets Section 240(1).

[4] Plaintiffs ask the Court to discount evidence that was created or based on conversations with Mr. Lewis the day after his accident because he was allegedly under the influence of drugs and general anesthesia that day. *See, e.g.*, Dkt. No. 171 at 7, n.7. That request is best directed to a factfinder, not to the Court deciding a summary-judgment motion.

and provided proper protection and that Mr. Lewis fell for another reason altogether. *See, e.g.*, *Gaspar v. Pace University*, 101 A.D.3d 1073, 1074 (2d Dep't 2012) (dismissing cause of action alleging a violation of NYLL § 240(1) where "injured plaintiff fell because he lost his balance"). Given that there are genuine issues of fact material to the question whether the ladder provided adequate protection, the case raises a triable issue and Plaintiffs are not entitled to summary judgment on this count.

By the same token, Lendlease and NYP are not entitled to a judgment dismissing Plaintiffs' NYLL § 240(1) claims. Drawing all inferences in favor of Plaintiffs as the party against whom summary judgment is sought, a reasonable jury viewing the evidence could credit Mr. Lewis's testimony that the ladder moved and failed to provide proper protection in violation of NYLL § 240(1) and could conclude that the statements to which Defendants refer either do not reflect the exclusive causes of Mr. Lewis's fall or do not constitute Mr. Lewis's statements at all. A reasonable jury could find that the movement of the ladder was a proximate cause of Mr. Lewis's injury.[5] *See Goodwin v. Dix Hills Jewish Center*, 144 A.D.3d 744, 747 (2d Dep't 2016) (granting summary judgment to plaintiff where he fell after a ladder on which he was standing started swinging because "the plaintiff's proof established that the ladder from which he fell was inadequately secured to provide him with proper protection, and that the failure to secure the ladder was a proximate cause of his injuries"); *Grant v. City of New York*, 109 A.D.3d 961, 962 (2d Dep't 2013) (granting summary judgment to plaintiff who fell after ladder slipped); *LaGiudice v. Sleepy's Inc.*, 67 A.D.3d 969, 971 (2d Dep't 2009) (summary judgment granted

---

[5] Although a ladder collapsing, moving, or falling can show a violation of the statute, there are other ways that a ladder can fail to provide proper protection. *See, e.g.*, *Kolenovic v. 56th Realty, LLC*, 139 A.D.3d 588, 589 (1st Dep't 2016) (denying dismissal of plaintiff's NYLL § 240(1) claim in light of testimony "that the ladder shook and was wet and was too close to the wall to allow room for his feet on the rungs").

where ladder shifted causing plaintiff to fall); *Kijak v. 330 Madison Avenue Corp.*, 251 A.D.2d

152, 153 (1st Dep't 1998) (summary judgment granted where ladder, which was not secured and

was relatively flimsy, wobbled causing plaintiff to fall).

      The evidence to which Defendants point that the ladder itself was not defective is not

sufficient to entitle Lendlease and NYP to summary judgment.  The test for liability for injuries

suffered when the plaintiff falls from a ladder is framed in the disjunctive.  "[T]here must be

evidence that the subject ladder was defective *or* inadequately secured and that the defect, *or* the

failure to secure the ladder, was a substantial factor in causing the plaintiff's injuries."  *Artoglou*

*v. Gene Scappy Realty Corp.*, 57 A.D.3d 460, 461 (2d Dep't 2008) (emphasis added); *Goodwin*,

144 A.D.3d at 747; *Messina v. City of New York*, 148 A.D.3d 493 (1st Dep't 2017) ("Plaintiff

was not required to show that the ladder was defective or that he actually fell off the ladder to

satisfy his prima facie burden"); *Hill v. City of New York*, 140 A.D.3d 568 (1st Dep't 2016)

("Defendants' argument that plaintiff was required to demonstrate that the ladder was defective

in order to satisfy his burden as to the Labor Law § 2401(1) claim is without merit.").  It is

enough under the law that the unsecured ladder moved or failed to support Plaintiff.[6]

---

[6] The cases relied upon by Defendants are distinguishable.  In *Stark v. Eastman Kodak Co.*, 256
A.D. 2d 1134 (4th Dep't 1998), the plaintiff, who injured himself when he stepped from the
second rung of a ladder believing it was the bottom rung, did not fall from the ladder and
conceded that the ladder was not defective and did not move as he descended.  In *Smith v. E.I.
DuPont de Nemours & Co.*, 2004 WL 941495, at *3–4 (W.D.N.Y. Mar. 30, 2004), the plaintiff
injured himself when he stepped off of the fourth or fifth step of a ladder believing he was on the
first or second step and toppled to the ground.  The plaintiff conceded that the ladder was in fine
condition, that it did not slip or shift beneath him, and that he did not actually fall off the ladder.
In *Ellerbe v. Port Auth. Of New York & New Jersey*, 91 A.D. 3d 441 (1st Dep't 2012), the court
found that the plaintiff sustained his *prima facie* case notwithstanding plaintiff's statement
immediately after he was injured that he fell because he "lost his footing."  The plaintiff testified
at deposition that he fell from a ladder after the ladder "reared back" when he attempted to
dismount.

Lendlease and NYP further argue that they are entitled to dismissal of Plaintiffs' NYLL § 240(1) claims because Mr. Lewis was the "sole proximate cause" of the accident.  Dkt. No. 158 at 20; *see also* Dkt. No. 182 at 16.  In support of this argument, Lendlease points to evidence that Mr. Lewis lost his balance while reaching for his spray gun and after he bumped into the piece of hanging black iron.  *See* Dkt. No. 158 at 22.[7]  According to Lendlease, Mr. Lewis's accident resulted from his own loss of balance rather than a defect or inadequacy in the ladder he was using.  But testimony that someone fell when he lost his balance is not necessarily incompatible with testimony that the ladder on which he was standing moved.  Indeed, it is reasonable to infer that a moving ladder would cause someone to lose their balance and fall.  "Where credible evidence reveals differing versions of the accident, one under which defendants would be liable and another under which they would not, questions of fact exist making summary judgment inappropriate."  *Ellerbe*, 91 A.D.3d at 442.  Lendlease and NYP have failed to show that they are entitled to summary judgment on this count.

**B.    NYLL § 241(6)**

Section 241(6) provides that:

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.  The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith.

"To prevail on a cause of action alleging a violation of [NYLL] § 241(6), a plaintiff must establish the violation of an Industrial Code provision that sets forth specific, applicable safety

---

[7] NYP asserts, without elaboration, that "the proximate cause of the accident was not that the ladder was an improper device, but plaintiff misusing the ladder."  Dkt. No. 182 at 20.  NYP does not cite any evidence that Mr. Lewis was misusing the ladder, and the Court declines to consider this conclusory argument.

standards." *Norero v. 99-105 Third Ave. Realty, LLC*, 96 A.D.3d 727, 728 (2d Dep't 2012).

Plaintiffs argue that, by violating various provisions of the New York Industrial Code (the

"Industrial Code"), Lendlease and NYP are liable for violations of NYLL § 241(6).  Plaintiffs

invoke two provisions of the Industrial Code that they claim were violated by Lendlease and

NYP: Industrial Code § 23-1.21(b)(4)(ii) and § 23-1.21(b)(4)(iv).  12 NYCRR § 23-

1.21(b)(4)(ii), (iv).  Lendlease and NYP cross-move for summary judgment.

### 1.    Industrial Code § 23-1.21(b)(4)(ii)

Section 23-1.21(b)(4)(ii) provides that "[a]ll ladder footings shall be firm.  Slippery

surfaces . . . shall not be used as ladder footings."  An unsecured ladder without rubber footings

may give rise to a violation of Industrial Code § 23-1.21(b)(4)(ii).  *See Martinez v. ST-DIL LLC*,

192 A.D.3d 511, 513 (1st Dep't 2021).  Plaintiffs argue Mr. Lewis's "uncontroverted" testimony

is that the ladder "had only metal footings" and that the ladder's movement caused him to fall.

Thus, according to Plaintiffs, the undisputed evidence is that Industrial Code § 23-1.21(b)(4)(ii),

and thus NYLL § 241(6), was violated.  Dkt. No. 138 at 21.

Lendlease and NYP point out that Mr. Lewis's testimony does not say that the ladder's

footings were made solely of metal or that the ladder slipped and that this slip caused his fall.[8]

Mr. Lewis's testimony as it relates to the ladder footing is as follows:

---

[8] Lendlease also argues that Plaintiffs' failure to allege in its Second Amended Complaint that
Lendlease violated any specific provisions of the Industrial Code is fatal to their claim.
"Contrary to the defendants' assertion, the fact that [Industrial Code] provisions were not cited in
the complaint or in the plaintiff's bill of particulars does not preclude the court from considering
them."  *Cassidy v. Highrise Hoisting & Scaffolding, Inc.*, 2011 WL 9698364 (N.Y. Sup. Aug. 2,
2011) (trial order) (citing *Mills v. Niagara Mohawk Power Corp.*, 262 A.D.2d 901, 902 (3d
Dep't 1999)).  The language in *Cassidy*, 89 A.D.3d at 511, cited by Lendlease, that a plaintiff's
Section 241(6) claim was properly dismissed because he "failed to plead any applicable
Industrial Code violations to support his claim" does not compel a different conclusion—the
issue before the Appellate Division was whether a loading dock was a scaffold and thus fell
within a particular Industrial Code provision, not whether the claim was procedurally barred

Q:     And [the ladder you were using] was an X-Cell ladder?
A:     Yup.
Q:     And what color was it?
A:     I don't remember.
Q:     Do you remember what it was made of?
A:     Aluminum.
Q:     And did it have feet at the bottom?
A:     Some sort of a metal footing.
Q:     And was the ladder, in your opinion, safe to use during that week before
       the accident?
A:     Sure.  I don't know.
Q:     Did you have any complaints about it in the week before the accident?
A:     No.

Dkt. No. 139-7 at 48.  A ladder footing containing metal is not incompatible with the footing

having grips that would hold the ladder in place.  Plaintiffs point to no testimony that the footing

was comprised *solely* of metal, that it was missing the grips that could render the ladder in

compliance with Industrial Code § 23-1.21(b)(4)(ii), or that slippery surfaces were used as ladder

footings.  Nor do photographs in the record of the ladder show the bottom of the feet of the

ladder.  *See, e.g.*, Dkt. Nos. 120-4 at 6; 152-3 at 2; 183-6 at 5.  Mr. Lewis testified that he had no

complaints about the ladder in the week before the accident and that he never requested another

ladder from Mr. Halverson of X-Cell or anyone at the job site.  Dkt. No. 139-7 at 48.  The parties

also all agree that that "[t]he extension ladder which plaintiff [Mr.] Lewis was using the best,

most appropriate and safest ladder for the job, and the type of ladder X-Cell employees would be

expected to use when performing the firestopping and fireproofing work that plaintiff [Mr.]

Lewis was performing."  Dkt. No. 140 at ¶ 29.  Plaintiffs' contention that Mr. Lewis testified that

the ladder "had only metal footings," and thus, no grips on the bottom, is simply not supported

---

based on a failure to identify the provision in a complaint.  *See* Cassidy Br., 2011 WL 13239157
at *4–5.

by the record.  Plaintiffs' motion for summary judgment on their claim for a violation of NYLL § 241(6), vis-à-vis Industrial Code § 23-1.21(b)(4)(ii), is denied.

Lendlease and NYP also move for summary judgment on Plaintiffs' NYLL § 241(6) claim, with NYP pointing out that "Plaintiffs offer no evidence of the composition of the bottom of the footing" and thus "failed to offer proof of the factual predicate to show a violation of [Industrial Code] § 23-1.21(b)(4)(ii)."  Dkt. No. 182 at 21.  While a court is required to "construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor," "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 553, 554 (2d Cir. 2005).  Here, Plaintiffs, despite extensive discovery, have only pointed to testimony that the ladder had "[s]ome sort of metal footing," Dkt. No. 139-7 at 48, and have failed to offer any evidence from which a reasonable jury could find that the ladder footings lacked any rubber grips.  "Under these circumstances, the moving party [has met] the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys*, 426 F.3d at 554.

### 2.    Industrial Code § 23-1.21(b)(4)(iv)

Industrial Code § 23-1.21(b)(4)(iv) provides that:

> When work is being performed from ladder rungs between six and 10 feet from the ladder footing, a leaning ladder shall be held in place by a person stationed at the foot of such ladder unless the upper end of such ladder is secured against side slip by its position or by mechanical means.

Plaintiffs assert that they are entitled to judgment on their claim that Lendlease and NYP violated NYLL § 241(6) by violating this provision because "Mr. Lewis has demonstrated that he was performing work from a ladder rung at least 6 feet high at the time he fell" and because "it is undisputed that said ladder was not being held by another person."  Dkt. No. 138 at 23.

Lendlease and NYP respond that they are entitled to dismissal of this claim because "Plaintiff was standing below the 6-foot level at the time of the accident."  Dkt. No. 158 at 26; *see also* Dkt. No. 182 at 22–23.  The resolution of this claim preliminarily depends on there being genuine dispute over whether Mr. Lewis was on a rung six or more feet above the ladder footing—if there is no genuine dispute that Mr. Lewis was working below six feet on the ladder, the provision does not apply, and Lendlease and NYP are entitled to summary judgment.

Plaintiffs argue that Mr. Lewis "had to have been approximately six-and-a-half feet up the ladder" at the time he was working, given that he "testified at the time of the incident [that] . . . his head was level with the top of the wall."  Dkt. No. 138 at 22.  Plaintiffs support this assertion by explaining that, because Mr. Lewis is 5' 4", his head being level with the top of the 11' 7" wall would mean that he must have been "approximately six-and-a-half feet up the ladder."  *Id.*  Indeed, if the top of Mr. Lewis's head was level with the top of the wall, his feet would be roughly 6' 3" off of the ground, and he would likely have been working on a rung over six feet above the ladder footings.  However, the testimony Plaintiffs point to in support of their assertion that Mr. Lewis's head was level with the top of the wall does not actually say so:

> Q:     Do you remember where in relation to your body were you  stuffing the mineral wool?
> A:     Perhaps the left.
> Q:     Was it the height of your head, above your head, the height of your shoulder, something else?
> A:     Probably toward my head.  I am just not exactly sure.

Dkt. No. 139-7 at 72; *see also* Dkt. Nos. 175 at 5; 138 at 22 (citing page 72 of Mr. Lewis's deposition transcript for the proposition that his head was level with the top of the wall). Further, Mr. Lewis testified that that to stuff mineral wool into the holes at the top of the wall, which he was doing before he fell, he thought he had to extend his arms and hands above his

head, which would suggest that his head was not level with the top of the wall.  Dkt. No. 139-7 at 71.

In contrast, Defendants adduced evidence that Mr. Lewis was working below six feet at the time of the accident.  Mr. Cohen testified that he measured the height of the sixth rung of the ladder Mr. Lewis was using and found that it was under six feet.  *See* Dkt. Nos. 139-3 at 113; 153-7 at 4.  He also wrote in an incident report that Mr. Lewis was working on the sixth rung of an extension ladder, Dkt. No. 153-7 at 4, and he testified that he believed that he based this description on a conversation with Mr. Lewis, Dkt. No. 139-3 at 113.  Mr. Lewis himself testified that he began his work on the fourth or fifth rung of the ladder and that to do the firestopping work, he worked from the fourth or fifth rung of the ladder.  Dkt. No. 139-7 at 64, 71.  Even in the absence of this evidence, Lendlease and NYP would be entitled to summary judgment.  The burden is on Plaintiffs to show that Mr. Lewis was performing work on ladder rungs at least six feet off the ground, and to survive summary judgment Plaintiffs must point to admissible evidence that would support a jury in finding for him on that element.  *See Jaramillo*, 536 F.3d at 145.  In the face of the substantial record evidence that Mr. Lewis was on a rung that was less than six feet high and the lack of evidence refuting this, the Court concludes that there is no triable issue on whether Industrial Code § 23-1.21(b)(4)(iv) was violated and grants Lendlease and NYP's motion for summary judgment on this count.

### C.    Lendlease's liability under Section 240(1) of the NYLL

Sections 240(1) and 241(6) impose liability on "owners and contractors and their agents." Lendlease asserts that it is not subject to statutory liability under Section 240(1) of the NYLL because it is a construction manager and thus, not an owner or contractor or an agent of an owner

or contractor.  Dkt. No. 158 at 17–20.[9]  Lendlease contends that it did not "have the ability to supervise and control the activity that brought about plaintiff's injury."  *Id.* at 18 (citing *Russin v. Louis N. Picciano & Son*, 54 N.Y.2d 311 (1981)).  In support of its position, Lendlease points out that it "was responsible for maintaining a schedule and budget for the project" and that it "did not perform any construction work."  *Id.* at 19.  It further explains that "[t]he means and methods of any work performed was the responsibility of the individual subcontractors" and that it "would not tell a subcontractor how to do its job, only what needed to be done."  *Id.* at 19.  By contrast, Plaintiffs argue that the undisputed evidence shows that Lendlease is an agent and thus strictly liable under the statute.

As a general matter, construction managers, engaged in the conduct of construction management, are not subject to statutory liability under NYLL § 240(1).  *See Walls v. Turner Construction, Co., Inc.*, 4 N.Y.3d 861, 863 (2005); *Bennett v. Hucke*, 131 A.D.3d 993, 994 (1st Dep't 2015) ("[A] construction manager is generally not considered a 'contractor' or 'owner' within the meaning of [the NYLL] §§ 240(1) or 241(6), but may nonetheless become responsible for the safety of the workers at a construction site as an agent of the owner or general contractor if it has been delegated the authority to supervise and control the work.").  An exception is made, however, where "the manager had the ability to control the activity which brought about the injury" and thus "has supervisory control and authority over the work being done when the plaintiff is injured."  *Walls*, 4 N.Y. 3d at 863–64 (affirming grant of summary judgment notwithstanding defendant's title as construction manager).  In that circumstance, the fact that an entity is called a construction manager does not shield it from liability under the statute, and

---

[9] Because the Court is granting summary judgment in favor of Lendlease and NYP on Plaintiffs' Section 241(6) claims on other grounds, it considers Lendlease's arguments only with respect to liability under Section 240(1) in this part.

"[t]he label of construction manager versus general contractor is not necessarily determinative." *Id.* at 864; *see also Tomyuk v. Junefield Assoc.*, 57 A.D.3d 518, 520 (2d Dep't 2008) ("Although a construction manager is generally not responsible for injuries under Labor Law s 240(1), it may be held vicariously liable as an agent of the property owner if it had the ability to control the activity which brought about the injury."); *Lodato v. Greyhawk N. AM., LLC*, 39 A.D.3d 491, 493 (2d Dep't 2007) (same). The theory is that "[w]hen the work giving rise to [the Section 240(1) duty] has been delegated to a third party, that third party then obtains the concomitant authority to supervise and control that work and becomes a statutory 'agent' of the owner or general contractor." *Russin*, 54 N.Y.2d at 318.

Plaintiffs argue that, notwithstanding Lendlease's title of "construction manager," there is no genuine dispute that it is subject to statutory liability under NYLL § 240(1) because of Lendlease's contractual obligations to supervise, manage, and coordinate the work of the subcontractors and authority to stop work if Lendlease deemed it to be unsafe or if it violated safety protocols; because of the lack of a formally titled "general contractor" for the construction process; and because of Lendlease's responsibility to inspect the construction site for safety and cleanliness. *See* Dkt. No. 171 at 18–23.

The record evidence supports that Lendlease is an agent with supervisory control and authority and is thus liable under NYLL § 240(1). The agreement between NYP and Lendlease (the "Agreement") delegates "the work giving rise to" the Section 240(1) duties, *Russin*, 54 N.Y.2d at 318, and gives Lendlease the broad authority to supervise, manage, and coordinate the work of subcontractors and suppliers on the project. It provides that:

> Those portions of the Work that the Construction Manager [Lendlease] does not customarily perform with the Construction Manager's own personnel shall be performed under subcontracts or by other appropriate agreements with the Construction Manager, provided that, unless expressly agreed upon by the parties,

> the Construction Manager shall not directly perform any trade work other than minor work approved by Owner. . . . The Construction manager shall be responsible for supervising, managing and coordinating the work of the subcontractors and suppliers.

Dkt. No. 139-1 at § 2.3.2.1.  Under the Agreement, "[t]he Construction Manager shall schedule and conduct regular meetings to discuss such matters as procedures, progress, coordination, scheduling, and status of the Work," *id.* at § 2.3.2.4, and "shall record the progress of the Project," including keeping and making available to NYP "a daily log containing a record for each day of weather, portions of the Work in progress, number of workers on site, identification of equipment on site, problems that might affect progress of work, accidents, injuries, and other information required by" NYP, *id.* at § 2.3.2.7.  Tellingly, Lendlease's responsibilities extend to safety requirements.  The Agreement requires Lendlease to "implement quality control and safety programs acceptable to [NYP] [to] maintain all related records."  *Id.*  The Agreement thus provides the requisite agency relationship between NYP and Lendlease to make Lendlease liable for violations of Section 240(1).  *See Russin*, 54 N.Y.2d at 318 ("Only upon obtaining the authority to supervise and control does the third party fall within the class of those having nondelegable liability as an 'agent' under [S]ection[] 240.").

The subcontract between Lendlease, as "Contractor," and X-Cell, as "Subcontractor," (the "Subcontract") corroborates Lendlease's broad authority to manage subcontractors, including their safety programs.  It provides that:

> Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Work is its responsibility, even if Contractor establishes a safety program for the entire Project.  Subcontractor shall establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasi-governmental authorities having jurisdiction and by *Contractor* and Owner, *including, but not limited to, any requirements imposed by the Contract Documents*.

23

Dkt. No. 139-4 at 13 (emphasis added).  To implement that provision, the Subcontract gives the Contractor power to demand that X-Cell "stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to Contractor [Lendlease] have been taken."  *Id*.  It also requires X-Cell to "promptly report in writing to Contractor [Lendlease] . . . all accidents arising out of, or in connection with, the performance of the Work, whether on or off the Project site, which caused death, bodily injury or property damage, giving full details and statements of witnesses," *id*. at 13–14.  Under the Subcontract, the Subcontractor is required to "provide to Contractor a written site specific Safety and Health Program prior to the commencement of any Work on the Project [which] shall address tasks to be performed on the Project with attendant risk analysis and have appropriate controls and safeguards to prevent injury and illness."  *Id*.  Significantly, the Subcontract provides that "Contractor will review the Safety and Health Program prior to the start of the work" and that "[a]ny questions, comments, or inquiries by Contractor as to the adequacy of this program must be completely addressed by Subcontractor before Work is started."  *Id*.  The Subcontract requires the work to "be performed and furnished under the direction and to the satisfaction of the Architect and Contractor," but it does not make Lendlease "responsible for construction means, methods, techniques, sequences, or procedures of" X-Cell.  *Id*. at 16.  If at any time the Subcontractor "fail[s] in the Contractor's opinion in the performance or observance of any of the covenants, conditions, or other terms of th[e] Subcontract [including those related to safety]," *id*.  at 17, then the Contractor can exercise a number of remedies, including performing the work itself or terminating the Subcontract, *id*. at 17–18.

Lendlease's conduct further corroborates that it understood that the Contract delegated to it NYP's safety obligations.  *Cf. Walls*, 4 N.Y.3d at 864 (relying in part on testimony of

defendant's representative that defendant had "authority to control activities at the work site and to stop any unsafe work practices" in affirming summary judgment). The Lendlease representative offered the uncontradicted testimony at his deposition that: (i) the subcontractors working at the premises would report to the Lendlease superintendent on site, Dkt. No. 139-3 at 29–30; (ii) Lendlease inspected the work performed by subcontractors at the premises, *id.* at 33; (iii) Lendlease typically conducted a walkthrough of the site every day, *id.* at 37–38; (iv) NYP did not give instructions to the subcontractors or hire them, *id.* at 39, 44, notwithstanding its ultimate ability, not exercised in this project, to overrule a hiring decision by Lendlease, Dkt. No. 139-2 at 21–22; (v) Lendlease had the ability, albeit never exercised, to stop a subcontractor from doing work if it was being done incorrectly or violated safety protocols, Dkt. No. 139-3 at 45; (vi) Lendlease had a safety program for the project and had safety rules for the subcontractors doing work at the premises, *id.* at 50–51; and (vii) Lendlease ran safety orientation meetings for new employees and conducted safety stand-downs with all employees on site, *id.* at 52–53. NYP's project manager in charge of overseeing capital projects at the premises in September of 2018, Dkt. No. 139-2 at 17, testified that Lendlease was responsible for inspecting the construction site for its safety, *id.* at 37. In their Rule 56.1 statements, the parties explicitly do not dispute that Lendlease had the authority to stop X-Cell's work if Lendlease deemed it to be unsafe; that Lendlease could, in its sole discretion, terminate its subcontract with X-Cell; or that Lendlease inspected the work of every subcontractor, including X-Cell, and told the subcontractors what had to be done and where. Dkt. No. 140 at ¶¶ 7–9; *see also* Dkt. No. 139-3 at 33.

The undisputed evidence in the record supports a jury verdict that Lendlease was "an agent of the property owner [because] it had the ability to control the activity which brought

about the injury," making summary judgment in favor of Lendlease inappropriate. *Tomyuk*, 57 A.D.3d at 520; *see also id.* ("Junefield had the ability to control that activity since, pursuant to its contract with the owner, it was responsible for assuring the satisfactory performance of the trade contractors, there was no general contractor, and it assigned one of its employees as a project manager to work at the job site every day."); *Lodato*, 39 A.D.3d at 492–93 (concluding that construction manager was a statutory agent and thus liable for violations of NYLL §§ 240(1) and 241(6) where it was responsible for monitoring the performance of contractor work, coordinating and scheduling the work of contractors on the project, complying with all applicable rules and laws regarding safety, and had the authority to direct contractors to cease unsafe work). Lendlease's argument that it did not control the "means and methods" of Mr. Lewis's work bears on the question of whether it can be held liable in negligence for the resulting injury, as addressed in Part D, *infra*.  It does not mean that Lendlease cannot be held liable as a statutory agent of NYP—an entity that the New York State legislature, through its enactment of the absolute-liability Section 240(1), has determined should bear the responsibility for faulty equipment that causes injuries.  *Cf. Boccio v. Bozik*, 41 A.D.3d 754, 755 (2d Dep't 2007) (noting that the language of the homeowners' exemption of NYLL § 240(1)—that a homeowner cannot be liable if it does "direct or control" the work—"refers to the situation where the owner supervises the method and manner of the work" and "protect[s] those who[] lack[] business sophistication").

II.     **NYLL § 200 and Negligence Claims**

Lendlease and NYP move for summary judgment on Plaintiffs' NYLL § 200 and

negligence claims, asserting that, because they did not actually supervise or control the portion of

the work which resulted in Mr. Lewis's fall and injury, they cannot be held liable in negligence.

It is not sufficient under NYLL § 200 that Lendlease possessed some authority and control over

the construction work.

Section 200 of the New York Labor Law provides that:

> All places to which this chapter applies shall be so constructed, equipped, arranged,
> operated and conducted as to provide reasonable and adequate protection to the
> lives, health and safety of all persons employed therein or lawfully frequenting such
> places.  All machinery, equipment, and devices in such places shall be so placed,
> operated, guarded, and lighted as to provide reasonable and adequate protection to
> all such persons.

"[T]his section merely codifies the common-law duty of owners and general contractors to

furnish a safe workplace."  *Rapp v. Zandri Construction Corp.*, 165 A.D.2d 639, 641 (3d Dep't

1991).  "As a result, it is appropriate to analyze the common law and [NYLL] § 200 claims

simultaneously."  *Lamela v. City of New York*, 560 F. Supp. 2d 214, 221 (E.D.N.Y. 2008).

Generally, where the claimed defect in safety "arises out of a subcontractor's own

methods or negligent acts occurring as a detail of a subcontractor's work, the duty is not

breached."  *Id.*; *Persichilli v. Triborough Bridge & Tunnel Auth.*, 16 N.Y.2d 136, 145 (1965) ("It

is by this time well settled that the duty to provide a safe place to work is not breached when the

injury arises out of a defect in the subcontractor's own plant, tools and methods, or through

negligent acts of the subcontractor occurring as a detail of the work.").  "However, in the

exceptional case where an owner or contractor actually exercises supervisory control over a

subcontractor's work, liability may nonetheless be imposed."  *Rapp*, 165 A.D.2d at 642; *see also*

*id.* (affirming denial of summary judgment where "evidence was sufficient to raise a factual

issue as to whether [defendant] assumed supervision and control over the construction site" where injury occurred). The requirement that an owner or contractor "exercised some supervisory control over the operation" before it can be held liable in negligence "is an outgrowth of the basic common-law principle that an owner or general contractor should not be held responsible for the negligent acts of others over whom the owner or general contractor had no direction or control." *Ross*, 81 N.Y.2d at 505 (1993) (cleaned up). This differs from the nondelegable, statutory duty imposed by NYLL § 240(1), under which the legislature has imposed liability on those who are in a position to ensure the safety of inherently dangerous worksites without regard for the level of care those entities exercise, *Zimmer*, 65 N.Y.2d at 521, and allows "an owner or contractor who breaches that duty [to] be held liable in damages regardless of whether it has actually exercised supervision or control over the work," *Ross*, 81 N.Y.2d at 500; *cf. Walls*, 4 N.Y.3d at 864 ("When the work giving rise to the duty to conform to the requirements of section 240(1) has been delegated to a third party, that third party then obtains the concomitant authority to supervise and control that work and becomes a statutory 'agent' of the owner or general contractor." (alteration omitted)). Under Section 200, there must be evidence that the defendant both "had control over the methods of the subcontractors and other worksite employees" in the sense that it had the ability to take action to prevent the danger that led to the plaintiff's injury and that "defendant knew or should have known of the danger to plaintiff." *Rizzuto*, 91 N.Y.2d at 353. Put otherwise, where "plaintiff's claim appears to arise from an alleged defect in the 'methods or materials' utilized by his employer," the plaintiff must show that "the general contractor . . . exercised the requisite degree of supervision and control over the portion of the work that led to [plaintiff's injury]." *Ross*, 81 N.Y.2d at 506. It is not enough that the contractor "undertook to 'supervise' the construction work and, further, to

comply with the legal standards governing the safety of all employees on the site, including those

of its subcontractors." *Id.*[10]; *see also In re World Trade Center Lower Manhattan Disaster Site

Litig.*, 57 F. Supp. 3d 328, 341 (S.D.N.Y. 2014); *see also Ortega v. Puccia*, 57 A.D.3d 54 at 62

(2d Dep't 2008) ("A defendant has the authority to supervise or control the work for purposes of

[NYLL] § 200 when that defendant bears the responsibility for the manner in which the work is

performed."); *Lamela*, 560 F. Supp.2d at 221 ("Both control and notice—either actual or

constructive—are required in order to impose liability on a party under [NYLL] § 200.").  "The

retention of the right to generally supervise the work, to stop the contractor's work if a safety

violation is noted, or to ensure compliance with safety regulations does not amount to the

supervision and control of the work site necessary to impose liability on an owner or general

contractor pursuant to [NYLL] § 200."  *Dennis v. City of New York*, 304 A.D.2d 611, 612 (2d

Dep't 2003).  Indeed, "[a]bsent any evidence that [a defendant] gave anything more than general

instructions as to what needed to be done, as opposed to how to do it, these entities cannot be

---

[10] New York courts are somewhat imprecise in articulating whether a court can hold an entity
liable in negligence when the entity possesses the requisite authority to control the means and
methods of a subcontractor's work or if the entity needs to actually exercise that authority for it
to be held liable.  *See, e.g.*, *Sullivan v. N.Y. Athletic Club*, 162 A.D.3d 955, 958 (2d Dep't 2018)
(explaining both that "an owner or contractor will not be held liable under [NYLL] § 200 unless
it had the authority to supervise or control the performance of the work" and that "[i]f the
challenged means and methods of the work are those of a subcontractor, and the owner or
contractor exercises no supervisory control over the work, no liability attaches under [NYLL]
§ 200 or the common law"); *LaRosa v. Internap Network Servs. Corp.*, 83 A.D.3d 905, 909 (2d
Dep't 2011) (same).  *Compare Cappabianca v. Skanska USA Bldg. Inc.*, 99 A.D.3d 139, 144 (1st
Dep't 2012) ("Where the injury was caused by the manner and means of the work, including the
equipment used, the owner or general contractor is liable [in negligence] if it actually exercised
supervisory control over the injury-producing work."), *with Lopez v. Dagan*, 98 A.D.3d 436, 439
(1st Dep't 2012) ("Plaintiff's [NYLL] § 200 and common-law negligence claims were properly
dismissed as against the engineer; there is no evidence that the engineer had the contractual right
to control the injury-producing work.").  In either event, however, the law is clear that
responsibility over safety generally is not sufficient where the injury is caused by the means and
methods of the subcontractor, unless the evidence is sufficient to show that the general contractor
stepped into the shoes of the subcontractor (or at least shared its shoes) with respect to that work.

held liable under [NYLL] § 200 or for common-law negligence." *O'Sullivan v. IDI Construction Co., Inc.*, 28 A.D.3d 225, 226 (1st Dep't 2006).

Lendlease and NYP are entitled to summary judgment.  It is undisputed that Plaintiffs' claim turns upon the means and methods of construction undertaken by Mr. Lewis and provided by his employer—the ladder supplied by X-Cell and the failure by X-Cell or its employees to secure it.  There is no evidence that Lendlease assumed or exercised control over that part of the work giving rise to Mr. Lewis's injury.  Lendlease had general responsibility for safety.  It did not assume responsibility for the ladders and equipment that X-Cell supplied to its employees or the way that X-Cell's employees used that equipment.  Indeed, Andrew Cohen of Lendlease offered the uncontradicted testimony in his deposition that, while Lendlease would tell a subcontractor what needed to be done, it would not tell them how to do it, because "[t]he methods and – the means in which work was performed was the responsibility of the subcontractor."  Dkt. No. 139-3 at 33–34.  Plaintiffs offered no evidence to refute that testimony or to create a genuine issue of fact.  In their counterstatement to Lendlease's Rule 56.1 statement, Plaintiffs do not contest Lendlease's assertion that "Defendant Lendlease would not tell a subcontractor how to do their job, only what needed to be done."  Dkt. No. 175 at 4.  And Mr. Lewis testified that on the day of his accident, he received his work instructions from someone in his company, *i.e.*, X-Cell.  Dkt. No. 139-7 at 34, 49.

There is no evidence to create a triable issue either that Lendlease or NYP possessed or exercised the requisite authority to control the means and method of Mr. Lewis's work or that either defendant had actual or constructive notice of the unsafe condition.  *See Ocampo v. Bovis Lend Lease LMB, Inc.*, 123 A.D.3d 456, 457 (1st Dep't 2014) (dismissing NYLL § 200 and common-law negligence claims "because the record shows that defendant did not exercise

supervisory control over the means and methods of the work."); *Mitchell v. Caton on the Park, LLC*, 167 A.D.3d 865, 867 (2d Dep't 2018) (affirming dismissal of NYLL § 200 and common-law negligence causes of action in light of evidence demonstrating that the defendant "had no authority to supervise or control the performance of the plaintiff's work"). The Subcontract between Lendlease and X-Cell provides that Lendlease "shall [not] be responsible for construction means, methods, techniques, sequences, or procedures of" X-Cell. Dkt. No. 139-4 at 16. There is no evidence that Lendlease had authority over the equipment supplied by X-Cell, or that they had notice of the unsafe condition. *See Gonzalez v. United Parcel Serv.*, 249 A.D.2d 210, 210–11 (1st Dep't 1998) (dismissing NYLL § 200 claims because "defendant's general oversight of the timing of the work and its quality[] is not to be equated with the direct supervision and control over the manner of the work's performance necessary to establish liability under [NYLL] § 200, or at common law for negligence"); *Wright v. Ellsworth Partners, LLC*, 143 A.D.3d 116, 1120 (3d Dep't 2016) (holding that where "the record confirms that [defendants did not] exercise[] any direct control over [plaintiff's employer's] employees or the manner in which their work was performed," dismissal of NYLL § 200 and common-law negligence claims was proper). Nor is there evidence that Mr. Lewis ever took orders or suggestions from Lendlease or NYP related to how to perform his work. *See Singh v. Black Diamonds LLC*, 24 A.D.3d 138, 140 (1st Dep't 2005) (testimony that construction manager "conducted regular walk-throughs and, if he observed an unsafe condition, had the authority to find whoever was responsible for the condition and have them correct it or, if necessary, stop the work . . . simply indicates [his] general supervision and coordination of the worksite and is insufficient to trigger liability" under NYLL § 200) ; *Francis v. Plaza Const. Corp.*, 121 A.D.3d 427, 428 (1st Dep't 2014) (affirming dismissal of NYLL § 200 claim where "[t]here is no

evidence that [defendant's] employees ever gave specific instructions to plaintiff, [or] his employer (a subcontractor on the site)").

The inappropriateness of negligence liability is even more clear respect to NYP.  No reasonable jury could, on this record, conclude that NYP assumed or exercised the authority to direct X-Cell or its employees how to perform their work or what equipment to supply. Lendlease would not provide to NYP lists of where the subcontractors were on specific days or which employees were working on the site on a given day.  Dkt. No. 139-2 at 31.  NYP's relevant project manager never told Lendlease that a subcontractor needed more employees to perform their work, *id.* at 33.  NYP would not inspect the construction site for its safety or cleanliness, *id.* at 37, never exercised authority to stop a project that was happening because of a belief that it was unsafe, *id.* at 38, never provided subcontractors with equipment, *id.*, never spoke to subcontractors directly about their work beyond social niceties, *id.* at 39, and never told a subcontractor how to perform their work, *id.* at 40.  Nor is there any evidence in the record that NYP had notice of an unsafe work condition that could have caused Mr. Lewis's injury.

Lendlease and NYP are entitled to dismissal of Plaintiffs' NYLL § 200 and negligence claims against them for two independent reasons.  There is no evidence that Lendlease or NYP ever assumed or exercised responsibility for the means and methods of X-Cell's work or the portion of the work which led to Mr. Lewis's injury.  There also is no evidence from which a jury could find that either had notice of an unsafe work condition.

**CONCLUSION**

The Plaintiffs' motion is DENIED except insofar as it relates to Lendlease's ability to be held liable for any violation of NYLL § 240(1).  Lendlease's motion is GRANTED IN PART and DENIED IN PART; it is entitled to summary dismissal of Plaintiffs' claims against it under NYLL §§ 241(6) and 200 and for negligence.  NYP's motion is GRANTED IN PART and

32

DENIED IN PART; it is also entitled to summary dismissal of Plaintiffs' claims against it under NYLL §§ 241(6) and 200 and for negligence.  The Court will resolve those parts of Lendlease's and NYP's motions that seek indemnification by separate order.

The Clerk of Court is respectfully directed to close Dkt. No. 137.


SO ORDERED.


Dated: December 2, 2021
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge